**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-224-DLF** |
| **v.** | : | |
| | : | |
| **JONATHAN COPELAND,** | : | |
| | : | |
| **Defendant.** | : | |

**<u>UNITED STATES' OMNIBUS MOTIONS *IN LIMINE*</u>**

The United States respectfully submits this omnibus brief arguing motions *in limine* in advance of the trial in this case scheduled for February 5, 2024. "Motions in limine are designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Barnes v. D.C.*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013) (quoting *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 10 (D.D.C. 2011)). The government offers the authorities and analysis below to promote efficiency and reduce the need to argue objections mid-trial. The parties nonetheless intend to meet and confer on all issues, to include possible stipulations, agreements, concessions, etc., to ensure a streamlined presentation. For each motion herein, the United States asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.

# TABLE OF CONTENTS

I.    Factual Background...............................................................................................................3

II.   Motion *in Limine* to Admit Certain Categories of Multimedia.........................................9

   A.  Legal Framework ............................................................................................................9

   B.  Overlapping Bases for Admissibility of Multimedia ...................................................10

      1.  Authentication by a Witness with Knowledge...................................................10

      2.  Authentication by Metadata ...............................................................................11

      3.  Authentication by Comparison ..........................................................................12

      4.  Authentication Based on Process or System that Produces an Accurate Result.............13

      5.  Authentication Based on Status as an "Official Publication" ...........................13

   C.  Categories of Multimedia to be Offered......................................................................14

III.  Motions *in Limine* to Admit Certain Statutes and Records............................................15

   A.  Judicial Notice of the Federal Electoral College Certification Law ...........................15

   B.  Admission of the Congressional Record and S. Con. Res 1 .......................................16

IV.   Motions *in Limine* to Limit Unnecessary Discussion of Security-Related Topics ....................16

   A.  Exact Locations of USCP Cameras.............................................................................18

   B.  Secret Service Protocols..............................................................................................18

V.    Motion *in Limine* to Preclude Defendant's Introduction of His Own Out-of-Court Statements as Inadmissible Hearsay ...........................................................................................20

VI.   Motion *in Limine* to Preclude Self-Defense or Defense of Others Argument ..........................21

VII.  Motion *in Limine* to Preclude Improper Defense Arguments ....................................................21

   A.  First Amendment..........................................................................................................21

      1.  Admission of Defendant's Statements Does Not Violate the First Amendment............21

      2.  Defendant Should be Precluded from Raising a First Amendment Defense to the Jury.23

   B.  Charging Decisions and Selective Prosecution ...........................................................24

   C.  Entrapment or Public Authority Defenses ...................................................................24

   D.  Jury Nullification: Penalties and Collateral Consequences.........................................27

## I.  Factual Background

This recitation of facts is intended to summarize, but not necessarily include all of, the government's evidence.

The defendant in this case, Jonathan Copeland, resides in Lima, Ohio. On January 5, 2021, he drove to the District of Columbia. That day, he attended a rally at Freedom Plaza. The following day, on January 6, the defendant dressed in grey hooded sweatshirt with a yellow sticker on the left chest; a green bandana, at times, and red hat, at other times; khaki pants; a plaid collared shirt; black boots; gloves; and safety goggles.

The defendant attended a portion of the rally at the Ellipse, in support of then-President Donald Trump, a candidate in the 2020 Presidential Election.

After attending the rally, the defendant marched with others to the Peace Circle, located on U.S. Capitol grounds, and moved to the front of a line of rioters beside a bike-rack style barrier, manned on the opposite side by several U.S. Capitol Police ("USCP") officers protecting the U.S. Capitol complex. At approximately 12:52 p.m., rioters, defendant included, advanced on the bike-rack fences and pushed through them in order to move closer to the building. With outstretched arms, the defendant grabbed onto the bike racks and pushed through the bike rack barriers as other rioters attacked the officers.



*The defendant, circled in yellow*



*The defendant's hand, circled in yellow*

After the rioters trampled over the barriers, they charged forward towards the western portion of the Capitol, on the West Plaza. At approximately 1:32 p.m., the defendant participated in hoisting and pushing a large metal sign frame holding an oversized "TRUMP" sign into a defensive line of Metropolitan Police Department ("MPD") and USCP officers attempting to prevent a further advance. Specifically, the defendant placed both hands onto the sign and pushed it into the line of officers.

As will be established at trial, the all-metal sign frame was approximately eight feet tall and

ten feet wide, welded with screws, and supported by large casters that were approximately the size of a person's head. As described by one USCP officer who was a member of that defense line, the sign frame was heavy, and it took at least fifteen officers to carry the sign away after the rioters thrust it into the line.



*The defendant, circled in yellow*



*An overhead screenshot from Closed Circuit Video depicting the struggle between police and rioters*

After pushing the sign against police and while still on the West front, the defendant began to argue with a photographer within the crowd. At 2:10 p.m., the defendant grabbed a camera man's sleeve as a group of rioters attacked the photographer and pushed him off a ledge.



*A screenshot depicting the defendant, circled in yellow, during the initial aggression against the cameraman.*

At 2:25 p.m., the defendant then entered the actual Capitol building, through the Senate Wing Door, traveling through the Crypt and to the Capitol Visitor Center (changing the bandana he wore on his head). He exited at approximately 2:41 p.m., through the Senate Wing Door. He remained on the Capitol premises for some time, before finally leaving the grounds.



*The defendant entering the U.S. Capitol, wearing a different color bandana on his head*

In a non-custodial interview on or about February 10, 2021[1], the defendant admitted that he was in Washington, D.C. on January 6, 2021, and that he drove with another person from Ohio to the Stop-the-Steal rally near the Ellipse. About three-quarters of the way through the former President's speech, the two left the area and walked to the U.S. Capitol. According to the defendant, he followed a group of people climbing on the scaffolding, entering the U.S. Capitol through an open door. While inside of the Capitol, he claimed to have observed a stand-off with police, saw smoke and tear gas, and heard chanting. After he left the D.C. area, he deleted his social media accounts, and threw away his cell phone.

As a result of his conduct, the defendant was indicted by a federal grand jury, charged with nine counts, including:

1. Count 1 – Civil Disorder (for pushing the barrier at the Peace Circle);

2. Count 2 – Assault Using a Dangerous Weapon (for pushing the sign);

3. Count 3– Civil Disorder (for pushing the sign at police);

4. Count 4 – Entering and Remaining in a Restricted Building or Grounds with a Dangerous Weapon (for unlawfully trespassing with said sign);

5. Count 5 – Disorderly and Disruptive Conduct (for his overall conduct);

6. Count 6 – Engaging in Physical Violence in a Restricted Building or Grounds (for pushing with the sign);

7. Count 7 – Disorderly Conduct in a Capitol Building (for his overall conduct);

8. Count 8 – Physical Violence in the Capitol Grounds or Building (for his overall conduct);

9. Count 9 – Parading, Demonstrating, or Picketing in a Capitol Building (for his overall conduct inside).

---

[1] The defendant also separately spoke to the FBI over the telephone on or about February 5, 2021, as well as on August 25, 2022 – after his arrest. The former interview was documented via a serialized report, whereas the latter interview was recorded. To avoid unnecessary exposition, the government's recitation of his one interview above is generally summarized.

Trial is scheduled to begin on February 5, 2024.

## II.   Motion *in Limine* to Admit Certain Categories of Multimedia

The government has identified, and provided to the defense, certain categories of photographic and video exhibits that it intends to offer at trial. The following sections describe each category of evidence and explain why each is admissible as relevant and authentic.

### A.  Legal Framework

"As a general rule, tangible evidence such as photographs must be properly identified or authenticated before being admitted into evidence at trial." *United States v. Blackwell*, 694 F.2d 1325, 1329 (D.C. Cir. 1982) (citations omitted). To satisfy this requirement, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Rule 901(b) provides a non-exhaustive list of examples of methods for showing authenticity. Those include, as relevant here:

> (1) *Testimony of a Witness with Knowledge*. Testimony that an item is what it is claimed to be.
> . . .
> (3) *Comparison by an Expert Witness or the Trier of Fact*. A comparison with an authenticated specimen by an expert witness or the trier of fact.
>
> (4) *Distinctive Characteristics and the Like*. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.
> . . .
> (7) *Evidence About Public Records*. Evidence that: (A) a document was recorded or filed in a public office as authorized by law; or (B) a purported public record or statement is from the office where items of this kind are kept.
> . . .
> (9) *Evidence About a Process or System*. Evidence describing a process or system and showing that it produces an accurate result.

Fed. R. Evid. 901(b)(1), (3), (4), (7), (9).

In making the showing necessary for admissibility, "the proponent's burden of proof" is "slight," and the "ultimate resolution of the evidence's authenticity is reserved for the jury." *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) (quoting *McQueeney v. Wilmington Tr.*

*Co.*, 779 F.2d 916, 928 (3d Cir.1985); *United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006)). To make the requisite *prima facie* showing, "circumstantial evidence of authenticity can be sufficient." *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981). And such evidence need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be," *Hassanshahi*, 195 F. Supp. 3d at 48 (citing *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (internal quotation marks and citation omitted)). Rather, the party offering the evidence need only "demonstrate that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated." *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) (quoting *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997) (internal quotation marks omitted)).

## B.  Overlapping Bases for Admissibility of Multimedia

As introduced herein, there are multiple, overlapping bases that the government intends to use for the authentication and introduction of photographs and videos at trial. The government offers this non-exclusive list of bases for authentication should the government be unable to enter into stipulations with the defendants in advance of trial.[2]

### 1.  Authentication by a Witness with Knowledge

To begin, any witness with knowledge of the events depicted in a photograph or video can authenticate the evidence, including but not limited to the person who took the photograph or video. *See* Fed. R. Evid. 901(b)(1). Here, that includes any person who was present for the events depicted in the photograph or video and has a recollection sufficient for them to recognize the scene depicted. *See, e.g.*, *Am. Wrecking Corp. v. Sec'y of Lab.*, 351 F.3d 1254, 1262 (D.C. Cir. 2003). Any individual that observed the events depicted in the photograph or video can testify that the photograph or video

---

[2] Consistent with its practice, the government intends to consult with defense counsel to reach appropriate stipulations to ensure an efficient and orderly trial.

appears to fairly and accurately show the events that took place. *See* FRE 901(b)(1); *see also United States v. Rembert*, 863 F.2d 1023, 1026 (D.C. Cir. 1988) (citing, *e.g.*, *Simms v. Dixon*, 291 A.2d 184 (D.C. 1972); E. Cleary, McCormick on Evidence (3d ed. 1984) at 671).

Even a person who was not present for a specific event can circumstantially establish the authenticity of a photograph or video depicting that event if they can (1) identify the location(s) depicted in the video; and (2) establish that the video is generally consistent with their knowledge of events that occurred during the Capitol riot. *See*, *e.g.*, *Rembert*, 863 F. 2d at 1028 ("Even if direct testimony as to foundation matters is absent . . . the contents of a photograph itself, together with such other circumstantial or indirect evidence as bears upon the issue, may serve to explain and authenticate a photograph sufficiently to justify its admission into evidence." (quoting *United States v. Stearns*, 550 F.2d 1167, 1171 (9th Cir. 1977) (Kennedy, J.)); *Holmquist*, 36 F.3d at 169 ("A photograph's contents, buttressed by indirect or circumstantial evidence, can form a sufficient basis for authentication even without the testimony of the photographer or some other person who was present at the time it was taken."). On this authority the government could authenticate riot footage through, for example, the testimony of an experienced Capitol Police officer who is familiar with all areas of the Capitol and who knows that the events of January 6 are unique in modern history. *Cf. United States v. Safavian*, 435 F. Supp. 2d 36 (D.D.C. 2006) (authenticating emails based on "distinctive characteristics" and citing Fed. R. Evid. 901(b)(4)); *Klayman v. Judicial Watch*, 299 F. Supp. 3d 141 (D.D.C. 2018) (admitting emails and advertisements by comparing later versions with admitted versions). Again, this is a low bar that requires only a *prima facie* showing that the evidence is what the government purports it to be — namely, photographs and videos of the Capitol siege in progress.

### 2.  Authentication by Metadata

Where necessary, the government can also authenticate the specific time or place of a

photograph or video using metadata. When a digital media file is extracted from a device or otherwise seized by the government, it often contains metadata that specifies the time, and sometimes place, the file was created, along with other information. At trial, the government may call law enforcement personnel to testify about the process of extracting data from digital devices and reviewing the extracted materials. Such testimony is sufficient to make a *prima facie* showing that a photograph or video was made at the time or place reflected in the metadata. *See, e.g.*, *United States v. Banks*, 43 F.4th 912, 918 (8th Cir. 2022) ("While the officers were not present when the images and videos were first captured, their testimony [about reviewing extraction reports] provided a rational basis to believe that the exhibits had been created within the relevant time frame and stored on [the defendant's] cellular phones."); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 547-48 (D. Md. 2007) ("Because metadata shows the date, time and identity of the creator of an electronic record, as well as all changes made to it, metadata is a distinctive characteristic of all electronic evidence that can be used to authenticate it under Rule 901(b)(4)."); *United States v. Gilbreath*, No. 3:19-CR-127-TAV-HBG, 2020 WL 5441226, at *3 (E.D. Tenn. Sept. 10, 2020) ("Metadata . . . showed that these images were created at defendant's home and on defendant's cell phone on September 12, 2015.").

### 3.  Authentication by Comparison

Similarly, and alternatively, in instances where precision of time and place is relevant but cannot be established by a witness with knowledge or by the media's metadata, the government will authenticate exhibits by reference to other, already-authenticated exhibits depicting the same time and place. This method of authentication by comparison is also routine. *United States v. Hoyt*, 946 F.2d 127, at *1 (D.C. Cir. 1991) (noting that Fed. R. Evid. 901(b)(3) permits authentication by comparison); *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1371 (Fed. Cir. Aug. 17, 2021); *Stearns*, 550 F.2d at 1171-72 (finding that first picture "authenticates the other four pictures as to time"); *Safavian*, 435 F. Supp. 2d at 40 (allowing authentication of emails by means of comparison

with other "emails that already have been independently authenticated").

### 4. Authentication Based on Process or System that Produces an Accurate Result

Certain multimedia, such as security cameras ("CCTV") operated by the USCP and body-worn cameras ("BWC") worn by officers of the MPD can be authenticated under Fed. R. Evid 901(b)(9) by "describing a process or system and showing that it produces an accurate result." *See United States v. Dale*, 991 F.2d 819, 843 (D.C. Cir. 1993) ("Tapes may be authenticated by testimony describing the process or system that created the tape"); *United States v. Pinke*, 614 F. App'x 651, 653 (4th Cir. 2015) (unpub.) (finding "sufficient evidence of authentication" of a prison's closed circuit video where "a Government witness explained the manner in which the prison's closed circuit video system operates, the means by which he obtained the video, and that he downloaded it onto the DVD that was played for the jury"). Several USCP and MPD witnesses to be called by the government are available to testify to the systems employed by USCP and MPD, respectively. These witnesses will be able to explain how the system is used, that it reliably records and depicts the areas that the camera faces, and the internal characteristics of videos — such as date and time stamps — which allow USCP and MPD to identify and retrieve segments of video.

### 5. Authentication Based on Status as an "Official Publication"

Certain evidence in this case, such as video taken by the Senate Recording Studio, is also "self-authenticating," meaning it "require[s] no extrinsic evidence of authenticity in order to be admitted." Fed. R. Evid. 902.[3] This is so because it qualifies as an "Official Publication[]," defined as any "book, pamphlet, or other publication purporting to be issued by a public authority." Fed. R. Evid. 902(5). Official materials published on government websites fall into this category and are self-

---

[3] Further underscoring the multiple paths to authentication, it is worth noting that Senate Recording Studio footage may also be authenticated through any of the mechanisms outlined in this motion, including Fed. R. Evid. 901(b)(1), (3), (4), (9).

authenticating under Rule 902. *See Williams v. Long*, 585 F. Supp. 2d 679, 689 (D. Md. 2008); *cf.*
*MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486 (S.D.N.Y. 2017) (Congressional
transcripts); *Singletary v. Howard Univ.*, No. 1:17-cv-01198, 2018 WL 4623569, at *4 n.1 (D.D.C.,
Sept. 26, 2018) *rev'd on other grounds* (government-issued guidebook).

As this Court knows, the United States Senate uses the Senate Recording Studio to
contemporaneously record Senate proceedings and distribute those recordings to the public. *See*
https://www.senate.gov/floor/, last accessed June 5, 2023 (publicly available archived recordings of
Senate Recording Studio). The Senate Recording Studio recorded the proceedings relating to the
Electoral College Certification on January 6, 2021, up to the point when the rioters breached the
building and forced the proceedings into recess. *See id.* (proceedings for January 6, 2021).
Subsequently, the Senate Recording Studio recorded the Electoral College Certification proceedings
after the rioters were cleared from the Capitol Building and the session resumed. *Id.* During the
interim, the Senate Recording Studio captured footage of rioters who were present on the Senate floor
during the recess.

### C.  Categories of Multimedia to be Offered

The government may seek to introduce certain videos and photos recovered from the
defendant's digital devices,[4] as well as videos and photographs taken by third parties, such as other

---

[4] The government often intends to introduce videos, images, and statements made by the defendant
via digital devices or media. The purpose of such evidence will be to provide evidence of his intent,
knowledge, and consciousness of wrongfulness. The relevance of such evidence depends on the
government's authenticating the relevant accounts as actually belonging to the defendant, which it
will readily accomplish. The government can prove a defendant's ownership of a social media account
using "circumstantial evidence linking the defendant to the social media account." *United States v.*
*Lamm*, 5 F.4th 942, 948 (8th Cir. 2021). Such circumstantial evidence can include "the presence of a
nickname, date of birth, address, email address, and photos." *United States v. Barber*, 937 F.3d 965,
970-71 (7th Cir. 2019) ("This court has relied on evidence such as on someone's Facebook page as
circumstantial evidence that a page might belong to that person."); *see also United States v. Bowens*,
938 F.3d 790, 795 (6th Cir. 2019) (finding that photograph of defendants, and first name of one
defendant, constituted sufficient "circumstantial evidence from which the jury could infer that the
defendants were the ones posting" incriminating social media content).

rioters and journalists who were present inside and outside the Capitol on January 6. Among other ways, these materials can be authenticated through the processes described in Sections I.B.1-3, *supra*.

The evidence at trial will also include video captured by law enforcement, including closed-circuit television (CCTV) and born-worn camera (BWC) footage. Like any other videos, these can be authenticated by any person with direct knowledge of the scene depicted or with sufficient circumstantial knowledge (*see* Fed. R. Evid. 901(b)(1) and discussion *supra* at Section I.B.1) or through metadata or comparison (*see* Fed. R. Evid. 901(b)(4) and discussion *supra* at Section I.B.2-3). Alternatively, given the automated nature of the recording devices in question, the BWC and CCTV footage can be authenticated under Rule 901(b)(9), which allows authentication by "[e]vidence describing a process or system and showing that it produces an accurate result." *See United States v. Dale*, 991 F.2d 819, 843 (D.C. Cir. 1993) ("Tapes may be authenticated by testimony describing the process or system that created the tape").

### III.   Motions *in Limine* to Admit Certain Statutes and Records

#### A.   Judicial Notice of the Federal Electoral College Certification Law

The proceedings that took place on January 6, 2021, were mandated by, and directed under the authority of, several constitutional and federal statutory provisions. In fact, as Vice President Pence gaveled the Senate to Order on January 6, 2021 to proceed with the Electoral College Certification Official Proceeding, he quoted directly from, and cited to, Title 3, United States Code, Section 17. The Court may thus take judicial notice of, and admit into evidence, copies of Article II, Section 1 of the Constitution of the United States, the Twelfth Amendment, as well as 3 U.S.C. §§ 15-18 relating to the Electoral College Certification Official Proceedings. It is well established that district courts may take judicial notice of law "without plea or proof." *See United States v. Davila-Nieves*, 670 F.3d 1, 7 (1st Cir. 2012). The government makes this request even though "no motion is

required in order for the court to take judicial notice." *Moore v. Reno*, No. 00-5180, 2000 WL 1838862, at *1 (D.D.C. Nov. 14, 2000). "[W]here a federal prosecution hinges on an interpretation or application of state law, it is the district court's function to explain the relevant state law to the jury." *See United States v. Fazal-Ur-Raheman-Fazal*, 355 F.3d 40, 49 (1st Cir. 2004).

### B.  Admission of the Congressional Record and S. Con. Res 1

The Congressional proceedings on January 6, 2021, were memorialized in the Congressional Record. The Congressional Record is a public record under Federal Rule of Evidence 902(5). *See MMA Consultants 1, Inc. v. Republic of Peru,* 245 F. Supp. 3d 486 (S.D.N.Y. 2017). The government intends to introduce portions of the Congressional Record at trial, including the bodies' "concurrent resolution to provide for the counting on January 6, 2021, of the electoral votes for President and Vice President of the United States." S. Con. Res. 1, 117th Cong. (2021). For the same reasons as the Senate Recording Studios footage above, these records should be admitted as self-authenticating.

### IV.    Motions *in Limine* to Limit Unnecessary Discussion of Security-Related Topics

Certain topics that could arise at trial — namely the exact locations of USCP CCTV cameras and the protocols of the U.S. Secret Service ("USSS") — have little to no probative value but would compromise significant security interests if needlessly disclosed to the public. The government does not intend to elicit any of the following topics in its case-in-chief and, therefore, cross-examination on such topics would be beyond the scope of direct and impermissible. Fed. R. Evid. 611(b). To the extent that defendants seek to argue that any of the following topics are relevant and within the scope of the government's examination, the government requests an order under Fed. R. Evid. 403 foreclosing unnecessary cross-examination on these topics.

It is well-established that a district court has the discretion to limit a criminal defendant's presentation of evidence and cross-examination of witnesses. *See Alford v. United States*, 282 U.S. 687 (1931) ("The extent of cross-examination [of a witness] with respect to an appropriate subject of

inquiry is within the sound discretion of the trial court."); *United States v. Whitmore*, 359 F.3d 609, 615-16 (D.C. Cir. 2004) ("The district court . . . has considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses."). A court has the discretion to prohibit cross-examination that goes beyond matters testified to on direct examination. Fed. R. Evid. 611(b). This is particularly so when the information at issue is of a sensitive nature. *See, e.g.*, *United States v. Balistreri*, 779 F.2d 1191, 1216-17 (7th Cir. 1985) (upholding district court's decision to prohibit cross-examination of agent about sensitive information about which that agent did not testify on direct examination and which did not pertain to the charges in the case), *overruled on other grounds by Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016).

The Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Even evidence that may be relevant to an affirmative defense should be excluded until the defendant sufficiently establishes that defense through affirmative evidence presented during his own case-in-chief. *See United States v. Lin*, 101 F.3d 760, 768 (D.C. Cir. 1996) (acknowledging trial court has discretion to limit cross-examination on prejudicial matters without reasonable grounding in fact); *United States v. Sampol*, 636 F.2d 621, 663-64 (D.C. Cir. 1980) (holding that trial court properly limited cross-examination of alleged CIA murder scheme until defense put forth sufficient evidence of the affirmative defense in its case-in-chief. Preventing the defendants from exploring the topics identified above will not infringe their Confrontation Clause right because the exact positions of cameras, the camera map, and U.S. Secret Service protocols, implicate national security concerns, are of marginal probative value, and any probative value can be addressed without compromising the protective functions of government agencies.

### A.  Exact Locations of USCP Cameras

The government seeks an order limiting the defense from probing, during cross-examination, the exact locations of Capitol Police surveillance cameras or from using the maps, which show each camera's physical location, as an exhibit at trial. The government produced such information to defendants in discovery pursuant to the Highly Sensitive designation of the Protective Order. *See* Discovery Email, September 16, 2022. The defendant has been able to make use of such information in order to identify evidence and prepare for trial; however, none of the information serves to illuminate any fact of consequence that is before the jury. This lack of relevance must be balanced against the national security implications at stake here. The U.S. Capitol Police's surveillance system serves an important and ongoing function in protecting Congress, and therefore, national security. Furthermore, the maps that show the physical location of cameras have been designated as "Security Information" under 2 U.S.C. § 1979, which generally requires approval of the Capitol Police Board before they may be released. Here, the video footage itself reveals the *general* location and angle of the camera's positioning. Additional details as to the precise location of the cameras are not relevant to the jury's fact-finding mission. Even assuming the evidence that the government seeks to exclude is marginally relevant, such relevance is substantially outweighed by the danger to national security.

### B.  Secret Service Protocols

To meet its burden of proof at trial, the government will call a witness from the United States Secret Service to testify that at the time of the Capitol breach, Secret Service agents were on duty to protect Vice President Mike Pence and his two immediate family members, all of whom were present at the Capitol. The witness will further testify about the Capitol breach's effect on the Secret Service's protection of Vice President Pence and his family members.

The very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking members of

the Executive branch and, by extension, national security. Thus, the government seeks an order limiting the cross-examination of the Secret Service witnesses to questioning about the federally protected function performed by the Secret Service as testified to on direct exam, namely, protecting the Vice President and his family. The government further requests that such order preclude cross-examination that would elicit information that does not directly relate to whether the Secret Service was performing that function at the Capitol on January 6, 2021. Specifically, cross-examination should not be permitted to extend to (1) Secret Service protocols related to the locations where protectees or their motorcades are taken at the Capitol or other government buildings when emergencies occur, and (2) details about the nature of Secret Service protective details, such as the number and type of agents the Secret Service assigns to protectees. These topics have no relevance to any issue at controversy, and even if they did, any relevance would be substantially outweighed by the danger of prejudicing the government's legitimate interest in the safety of senior government officials. *See* Fed. R. Evid. 403.

The government intends to offer the testimony that pursuant to authority under 18 U.S.C. § 3056(a)(1), on January 6, 2021, Secret Service agents were at the Capitol to protect Vice President Mike Pence and two members of his immediate family. A Secret Service official is further expected to explain how the events at the Capitol on that date affected the Secret Service's ability to protect Vice President Pence and his family. This testimony will both explain—in part—the bases for enhanced security controls at the Capitol on January 6 as well as establish an element of the charge at Counts One and Three, *i.e.*, that the civil disorder at the Capitol on January 6 interfered with a federally protected function.

Here, cross-examination of extraneous matters – like general protocols or the nature or number of protective details – is irrelevant. The disorder on January 6 interfered with the Secret Service's duties to protectees in this case insofar as they were required to take evasive action of the mob. Even

assuming the evidence to be excluded is marginally relevant, such relevance is substantially outweighed by the danger of confusion of the issues, mini-trials, undue delay, and waste of time. Broader cross-examination of Secret Service witnesses could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses. *Id.*

### V.    Motion *in Limine* to Preclude Defendant's Introduction of His Own Out-of-Court Statements as Inadmissible Hearsay

A defendant's own out-of-court statements are hearsay that cannot be admitted to prove the truth of any matter asserted. Fed. R. Evid. 801, 802. The government can offer the defendant's statements as statements of a party opponent, Fed. R. Evid. 801(d)(2)(A), or other non-hearsay or hearsay execution, but the defendant has no corresponding right to admit his own statements without subjecting himself to cross-examination.

Nor does Federal Rule of Evidence 106, the "Rule of Completeness," provide an end-run around the prohibition against hearsay. That rule provides that, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part--or any other writing or recorded statement--that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Rule 106 directs the Court to "permit such *limited portions* [of a statement] to be contemporaneously introduced as will remove the distortion that otherwise would accompany the prosecution's evidence. *United States v. Sutton*, 801 F.2d 1346, 1369 (D.C. Cir. 1986) (emphasis added). The rule does not "empower[] a court to admit *unrelated* hearsay." *United States v. Woolbright*, 831 F.2d 1390, 1395 (8th Cir. 1987) (emphasis added). "The provision of Rule 106 grounding admission on 'fairness' reasonably should be interpreted to incorporate the common-law requirements that the evidence be relevant, and be necessary to qualify or explain the already introduced evidence allegedly taken out of context . . . In almost all cases we think Rule 106 will be invoked rarely and for a limited purpose." *Sutton*, 801 F.2d at 1369.

**VI.     Motion *in Limine* to Preclude Self-Defense or Defense of Others Argument**

To establish a *prima facie* case of self-defense, the defendant must make an offer of proof of "(1) a reasonable belief that the use of force was necessary to defend himself or another against the immediate use of unlawful force and (2) the use of no more force than was reasonably necessary in the circumstances." *United States v. Biggs*, 441 F.3d 1069, 1071 (9th Cir. 2006). "If a defendant cannot proffer legally sufficient evidence of each element of an affirmative defense, then he is not entitled to present evidence in support of that defense at trial." *United States v. Cramer*, 532 Fed. Appx. 789, 791 (9th Cir. 2013) (citing *United States v. Bailey*, 444 U.S. 394, 415 (1980)).

Here, the defendant will not be able to put forth any evidence that he had a reasonable belief that his actions were necessary to defend himself, or others, against the immediate use of unlawful force. The defendant's actions – specifically helping the forefront of the mob to breach the first police line alongside the defendant's later use of a dangerous sign to propel into another police line – undermine any claim he was defending himself or others.

Absent a more specific proffer or evidence, the Court should exclude any testimony and evidence purporting to assert a claim of self-defense or defense of others.

**VII.    Motion *in Limine* to Preclude Improper Defense Arguments**

> **A.  First Amendment**

The United States moves this Court to admit in its case-in-chief statements that evince the defendant's motive or intent, or which go to prove an element of any offense with which he is charged. The government also moves *in limine* to preclude the defense from eliciting evidence or arguing to the jury that his statements and actions were protected by the First Amendment.

> > **1.  Admission of Defendant's Statements Does Not Violate the First Amendment**

The government may seek to introduce several statements, made by the defendant, that will aid the jury's determination as to whether the government has met the elements to show intent. *See*

*Mitchell*, 508 U.S. at 489 (the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent"). "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id.* Accordingly, the government asks that the Court rule that the First Amendment does not bar admission at trial of any statement that the government offers to establish the defendant's intent or an element of the crime.

Courts across the country, including this Court, have allowed evidence of defendant's statements for the purposes sanctioned by *Mitchell*. As Judge Cooper ruled in a different January 6 prosecution:

> Nor does the Court find any First Amendment concerns in the government's use of Robertson's statements to show intent. . . . If Robertson had expressed his views only through social media, he almost certainly would not be here. But he also allegedly took action—entering the Capitol without lawful authority in an alleged attempt to impede the Electoral College vote certification. His words remain relevant to his intent and motive for taking those alleged actions.

*United States v. Robertson*, 588 F. Supp. 3d 114, 124 (D.D.C. 2022) (internal citation omitted). Outside of the context of January 6th, *Mitchell* has been cited to uphold the admission of a wide range of statements, including but not limited to rap lyrics, terrorist materials, and speeches advocating civil disobedience. *United States v. Smith*, 967 F.3d 1196, 1205 (11th Cir. 2020) (rap lyrics); *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) ("This challenge is meritless, however, because here the speech is not 'itself the proscribed conduct.' The speech was not the basis for the prosecution, but instead it was used to establish the existence of, and [defendant's] participation in, the alleged RICO enterprise.") (internal citation omitted) (rap lyrics and tattoos); *United States v. Salameh*, 152 F.3d 88, 111-12 (2d Cir. 1998) (the defendants were not "prosecuted for possessing or reading terrorist materials. The materials seized . . . were used appropriately to prove the existence of the bombing

conspiracy and its motive"); *United States v. Fullmer*, 584 F.3d 132, 158 (9th Cir. 2009) (speeches advocating civil disobedience).

### 2. Defendant Should be Precluded from Raising a First Amendment Defense to the Jury

The government also moves *in limine* to preclude the defendant from arguing to the jury that his conduct was protected by the First Amendment. None of the offenses with which the defendant is charged punish speech, as crimes such as threats or solicitation do. "No matter [the rioter's] political motivations or any political message they wished to express, this alleged conduct is simply not protected by the First Amendment." *United States v. Nordean*, 579 F. Supp. 3d 28, 53 (D.D.C. 2021).

If the government establishes the elements of any of the offenses with which the defendant is charged, the First Amendment provides them no defense, even if evidence of the defendant's crimes is intertwined with political discussion and/or rhetoric. *See United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("[A]lthough the conspiracy was closely related to, and indeed proved by, many of the defendants' conversations about political and religious matters, the conviction was based on an agreement to cooperate in the commission a crime, not simply to talk about it"); *see also United States v. Hassan*, 742 F.3d 104, 127-28 (4th Cir. 2014) (citing *Amawi*).

Accordingly, any line of cross-examination or argument that the defendant may wish to make regarding the First Amendment is irrelevant under Fed. R. Evid. 401 because it lacks a "tendency to make the existence of [a] fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" and because he is not entitled to a First Amendment defense as a matter of law. To the extent there is any relevance to the defendant's First Amendment claims, the Court should exclude any questioning and argument along those lines under Fed. R. Evid. 403. Any attempt to shift the jury's attention to questions about whether the defendant's statements were protected by the First Amendment, rather than the charged offenses risks confusing the issues, wasting time, and unfairly prejudicing the jury.

### B.  Charging Decisions and Selective Prosecution

The United States moves *in limine* to exclude all evidence and arguments regarding its charging decisions. The Supreme Court has recognized that the "Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citing *Wayte v. United States*, 470 U.S. 596, 607 (1985)). "They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *Armstrong*, 517 U.S. at 464 (citing U.S. Const. Art. II, § 3); *see* 28 U.S.C. §§ 516, 547. As a general matter, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see also United States v. Batchelder*, 442 U.S. 114, 124-25 (1979) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints.").

The defendant should be precluded from introducing evidence or making arguments regarding charging decisions made by the United States. To the extent that the defendant seeks to present evidence or arguments that other individuals have not been charged for related conduct and/or that it is unfair that he has been charged, while other individuals involved in related criminal conduct remain uncharged or charged with lesser offenses, such evidence only serves to divert the jury's attention to matters unrelated to the defendants' guilt or innocence.

### C.  Entrapment or Public Authority Defenses

The defendant should be prohibited from making arguments or attempting to introduce evidence that law enforcement gave permission to the defendants to enter the U.S. Capitol. The defense of entrapment by estoppel only "applies to a defendant who reasonably relies on the assurance of a government official that specified conduct will not violate the law." *United States v. Alvarado*,

808 F.3d 474, 484–85 (11th Cir. 2015). Such reliance must be "objectively reasonable." *United States v. Barker*, 546 F.2d 940, 948 (D.C. Cir. 1976). This defense is unavailable in this case, for procedural as well as substantive reasons.

Federal Rule of Criminal Procedure 12.3(a)(1) requires the defendant to provide notice if he "intends to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense." Such notice must be in writing and be filed with the clerk "within the time provided for filing a pretrial motion, or at any later time the court sets." Fed. R. Crim. P. 12.3(a)(1). The notice must contain the law enforcement or federal intelligence agency involved, the specific agency member, and the time during which the defendant claims to have acted with public authority. Fed. R. Crim. P. 12.3(a)(2)(A)-(C). A failure to comply allows the court to exclude the testimony of any undisclosed witness except the defendant. Fed. R. Crim. P. 12.3(c). As of the date of this filing, the defendant in this case has not served notice pursuant to Rule 12.3(a)(1).

Nonetheless, the defendant should be precluded from advancing a public authority defense. As an initial matter, former President Trump did not have the authority lawfully sanction the attack on the United States Capitol on January 6 or any of the other criminal conduct allegedly perpetrated by the defendant. As Judge Howell wrote in rejecting the idea of an entrapment-by-estoppel defense for January 6 defendants:

> [A President] cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution. Thus, a President cannot, within the confines of his constitutional authority, prevent the constitutionally mandated certification of the results of a Presidential Election or encourage others to do so on his behalf, nor can he direct an assault on the coequal Legislative branch of government. Were a President to attempt to condone such conduct, he would act *ultra vires* and thus without the force of his constitutional authority. . . . Put simply, even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 32-33 (D.D.C. 2021). This Court has previously endorsed a similar approach. *See, e.g.*, *United States v. Kenneth Thomas*, 21-cr-552-DLF, Minute Orders on 3/21/23 and 5/8/23.

The same reasoning applies to any argument based on acts or omissions of the Capitol Police or other law enforcement: "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building." Memorandum and Order, *United States v. Williams*, No. 21-cr-377-BAH, at *2 (D.D.C. June 8, 2022). Even if the defendant could establish that a member of law enforcement told him that it was lawful to enter the Capitol building or allowed them to do so, the defendant's reliance on any such statement would not be reasonable in light of the "obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Chrestman*, 525 F. Supp. 3d at 32.

In addition to prohibiting any defense arguments that law enforcement actively communicated to the defendant that entering the Capitol building or grounds was lawful, the Court should also bar the defendant from arguing that any failure to act by law enforcement rendered his conduct legal. The same reasoning that applied in *Chrestman* again applies here. That is, like the Chief Executive, a Metropolitan Police Officer or Capitol Police Officer cannot "unilaterally abrogate criminal laws duly enacted by Congress" through his or her purported inaction. *Chrestman*, 525 F. Supp. 3d at 33. An officer cannot shield an individual from liability for an illegal act by failing to enforce the law or ratify unlawful conduct by failing to prevent it. In other words, "[s]ettled caselaw makes clear that law officer inaction—whatever the reason for the inaction—cannot sanction unlawful conduct." *Williams*, No. 21-cr-377-BAH, at *3.

Defendants in other, unrelated January 6 cases have introduced arguments that the defendants' actions were encouraged by agents of the government. Absent such a proffer of evidence, the

defendant should be precluded from making any such arguments to the jury, whether during a jury address or on cross-examination, such that the Court may evaluate the relevance of any such line of argument. *Cf. Michelson v. United States*, 335 U.S. 469, 481 (1948) (approving of the trial court's "scrupulous" efforts to guard against the asking of "a groundless question to waft an unwarranted innuendo into the jury box.").

### D. Jury Nullification: Penalties and Collateral Consequences

The defendant should be prohibited from making arguments or attempting to introduce irrelevant evidence that encourages jury nullification. As the D.C. Circuit has made clear,

> A jury has no more "right" to find a "guilty" defendant "not guilty" than it has to find a "not guilty" defendant "guilty," and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law. Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power.

*United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983). Evidence that only serves to support a jury nullification argument or verdict has no relevance to guilt or innocence. *See United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975); *see also United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("No reversible error is committed when evidence, otherwise inadmissible under Rule 402 of the Federal Rules of Evidence, is excluded, even if the evidence might have encouraged the jury to disregard the law and to acquit the defendant.").

In particular, the Court should permit no argument, evidence, or questioning regarding the potential penalties faced by a defendant are irrelevant to the jury's determination of guilt or innocence. *See Shannon v. United States*, 512 U.S. 573, 579 (1994) ("[A] jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" (quoting *United States v. Rogers*, 422 U.S. 35, 40 (1975))). Accordingly, the D.C. Circuit has held that "the jury is not to consider the potential punishment which could result from a conviction." *United States v. Broxton,* 926 F.2d 1180, 1183 (D.C. Cir. 1991).

**CONCLUSION**

For the foregoing reasons, the United States asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:     */s/ Gregory Rosen*
GREGORY ROSEN
VA Bar No. 82584
ALEXANDRA FOSTER
D.C. Bar No. 470096
Assistant United States Attorneys
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-6932
Email: Gregory.rosen@usdoj.gov